UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| GRANT HOUWMAN, | ) | CIV. 10-4125-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| vs. | ) | AND ORDER |
| | ) | |
| JON GAISER | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Grant Houwman, asserts claims of alienation of affections and deceit against defendant, Jon Gaiser, and seeks compensatory and punitive damages. Gaiser moves for summary judgment on Houwman's claims. Docket 26. Houwman resists the motion and moves to commence discovery on his punitive damages claim. Docket 21. Houwman also moves to exclude the expert testimony of Dr. Susan Eleeson. Docket 24. Gaiser resists these motions. For the reasons stated below, Houwman's motion to exclude expert testimony is denied, and Gaiser's motion for summary judgment is granted in part and denied in part.

**BACKGROUND**

In the light most favorable to Houwman, the nonmoving party on the summary judgment motion, the pertinent facts are as follows:

Houwman and Brittney Houwman (Brittney) were married in September 2001. In 2006, Brittney was hired as a controller for MetaBank, where Gaiser

was her supervisor. Soon after Brittney was hired, Gaiser began to fantasize about an affair with Brittney and wrote a pornographic story about an illicit encounter between him and Brittney at the workplace. He shared this story with Brittney after they began their affair. During the affair, Gaiser told Brittney that "the attraction was there for me on day one." Docket 29-2 at 5.

Starting in the spring of 2007 and continuing through September 2007, Gaiser and Brittney engaged in a sexual and emotional relationship. Brittney originally informed Houwman that the relationship started as an incident of "date rape." On a weekend when both Houwman and Gaiser's wife were out of town, Brittney hosted a gathering for her co-workers, including Gaiser. Gaiser and Brittney created a plan where Gaiser would leave with the other guests and then return so as not to raise suspicion. When he returned to the house, Gaiser began consuming additional cocktails with Brittney and the pair began kissing and fondling.

Gaiser and Brittney had discussed "hooking up" prior to that evening, but they did not end up having sex. Docket 40-2 at 2. Brittney asked Gaiser to sleep on the downstairs couch until he sobered up and could go home, but Gaiser came to her marital bed. Once Gaiser climbed into bed with Brittney, Brittney began to have her first panic attack. Gaiser helped Brittney calm down and then left for home. Gaiser knew at the time that what he was doing was

wrong and felt guilt and fear, yet he would have engaged in sexual intercourse with Brittney if the opportunity had arisen.

The next morning Gaiser called Brittney and asked her to come to his home. Brittney agreed to come over because she wanted to maintain her friendship with Gaiser, but she explicitly told Gaiser she would not engage in sexual intercourse with him. In addition, Brittney was not attracted to Gaiser at that time. Brittney went to Gaiser's home where they spent the day together. They napped together and then began kissing and fondling. Brittney did not want to have sexual intercourse. She cried and pulled her panties up and Gaiser told her, "We just need to get this out of our system this one time." Docket 40-3 at 3. Brittney stopped fighting Gaiser, and they had sex. Brittney testified that she "wouldn't consider the first time consensual." Docket 40-3 at 3. Afterward, Brittney cried.

Beyond the first incidence of sexual intercourse, there was no additional coerced sex, and the remainder of the affair was consensual. Brittney and Gaiser began to send romantic and illicit e-mails through personal e-mail accounts and continued to engage in sex. The pair shared, and subsequently engaged in, their sexual fantasies.

Brittney and Houwman had a troubled marriage, but they had love for each other before and during the affair. Brittney acknowledged that Houwman

was the most important person in her life and that she loved Houwman, even once the affair had begun.

Starting with the first night Gaiser came to Brittney's bed, Brittney began having panic attacks. Before that night, Brittney had never had panic attacks. Once the affair began, Brittney's emotional stability decreased. She believed that Gaiser, in his supervisory role at work, took advantage of her emotional instability. After the affair ended, Brittney had bouts of depression and anxiety, and she consumed alcohol most nights.

After Brittney informed Houwman of the relationship, she filed a sexual harassment discrimination claim against Gaiser. MetaBank hired an external investigator to investigate the claim. The South Dakota Division of Human Rights issued a finding of no probable cause for the sexual harassment claim, but Gaiser was fired by MetaBank for engaging in a sexual relationship with his inferior. As Gaiser acknowledged to Brittney, "good bosses probably wouldn't seduce their employees." Docket 29-2 at 10. Houwman did not learn until after the sexual harassment claim ended that the "the affair was entirely mutual and [Brittney] had been perpetrating the lies." Docket 29-4 at ¶ 20. Brittney and Houwman attended marriage counseling with Dr. Susan K. Eleeson, who saw them together as well as Brittney individually.

Brittney subsequently filed for divorce from Houwman in March 2009 and cited extreme cruelty and irreconcilable differences. Houwman filed a

counterclaim and cited extreme cruelty and adultery. On August 13, 2010, the circuit court granted a divorce to Houwman based on the ground of adultery. On August 26, 2010, Houwman filed the present suit against Gaiser.

## I.      Motion to Exclude Expert Testimony

Houwman argues that the testimony of Gaiser's proposed expert witness, Dr. Susan K. Eleeson, should be excluded because her opinions are unreliable under Federal Rule of Evidence 702. Houwman claims this is because Brittney was not fully forthcoming and did not tell Dr. Eleeson the truth.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *Sancom, Inc. v. Qwest Comm. Corp.*, 683 F. Supp. 2d 1043, 1050 (D.S.D. 2010). The rule specifically provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Using Rule 702, the trial judge becomes a "gatekeeper" who screens evidence to ensure its reliability and relevance. *Sancom*, 683 F. Supp. 2d at 1050 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). "The rule clearly is one of admissibility rather than exclusion." *Id.* (citing *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)). An expert's opinion should be excluded "only if it is so fundamentally unsupported

that it can offer no assistance to the jury." *Id.* (citing *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997)).

The district court applies a three-part test when screening proposed testimony for experts under Rule 702:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Sancom*, 683 F. Supp. 2d at 1051 (citing *Lauzon*, 270 F.3d at 686) (internal citations and quotations omitted).

First, Dr. Eleeson's specialized knowledge of human interaction and expertise in marriage counseling would be useful to the finder of fact in this case. Dr. Eleeson knows Houwman and Brittney well because she had counseling sessions with Brittney over a period of 35 months, and she met with both Brittney and Houwman 18 times. She was an insider to the Houwman marriage prior to its dissolution and after the Gaiser affair, and she can help the jury understand the marriage through an analysis of their marital problems with a psychological or scientific lens. Dr. Eleeson would provide helpful information as to whether Gaiser alienated Brittney's affections.

Second, Dr. Eleeson is qualified in this specific area to help the fact finder make its determination. Dr. Eleeson's curriculum vitae details her

education, background, and professional experience in the area of psychology.
Docket 43-1.  Dr. Eleeson has both a doctorate in psychology and philosophy
as well as a master's degree in counseling and a bachelor's degree in fine arts.
*Id.* She has been practicing professionally since 1998, but she gained
experience through clinical hours long before that time. *Id.* Dr. Eleeson is a
member of the American Psychological Association and the South Dakota
Psychological Association. *Id.* She participated in numerous professional
presentations and published pertinent literature on the topics of women's
health, psychology, and related issues. Dr. Eleeson is qualified to offer her
opinion to the jury.

  Finally, not only is Dr. Eleeson qualified in the area of psychology, but
she also has reliable knowledge of this case. Dr. Eleeson had counseling
sessions with Brittney over a period of 35 months and met often with both
Brittney and Houwman; therefore, she has psychological insight to both their
thought processes and emotional well-being. Houwman claims that
Dr. Eleeson's opinion is unreliable because Brittney did not tell Dr. Eleeson the
whole truth immediately about the affair, but Dr. Eleeson knew the majority of
the pertinent facts. Dr. Eleeson knew of the affair between Gaiser and Brittney,
she had counseling sessions with both Brittney and Houwman, and she based
her opinion on what she was told, what she observed, and her training and
experience. Dr. Eleeson said in her opinion letter that she was "simply

organizing and condensing what was told to me, what I observed, and my training as an expert in human behavior." Docket 43-2 at 3. Her knowledge is reliable.

Houwman also claims that Dr. Eleeson is impermissible as an expert witness because the state court judge in the Houwmans' divorce action found portions of her opinion unreliable. First, that opinion is not binding on this court. Second, the circuit judge was not "concerned" about Dr. Eleeson's opinion about Brittney and Houwman, the problems in the marriage, or how Brittney's conduct affected her. Instead, that judge was concerned with Dr. Eleeson's lack of qualification to opine about child custody. The judge concluded, "Eleeson's observations about the litigants give some insight that assists the court . . . ." Docket 43-3 at 23-24.

As a medical professional, Dr. Eleeson would give the jury valuable guidance to the health of the Houwman marriage and the impact of Gaiser upon it—a critical issue in this case. Dr. Eleeson's testimony will not be excluded because Rule 702 is one of inclusion, and her opinion is relevant, reliable, and would help the jury understand the issues in this case. Moreover, Houwman will have ample "opportunity to expose the testimony's weaknesses through vigorous cross-examination and the presentation of contrary evidence." *In re Prempro Products Liability Litigation*, 586 F.3d 547, 567 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).

8

II.    **Summary Judgment**

**STANDARD OF REVIEW**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] "A party asserting that a fact cannot be . . . disputed must support the assertion" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the . . . presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1)(A)-(B). The movant can also establish the absence of a disputed material fact by showing "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). The burden is initially placed on the moving party to establish the absence of a genuine issue of material fact and that the party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact.") (internal quotations omitted).

Once the moving party has met its initial burden, the nonmoving party must establish "that a fact . . . is genuinely disputed" either "by citing to particular parts of materials in the record," or by "showing that the materials

---

[1] Rule 56 was amended April 28, 2010, effective December 1, 2010. The comments to the 2010 amendments make clear, however, that the "standard for granting summary judgment remains unchanged."

cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)-(B). For purposes of summary judgment, the facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In determining whether a genuine issue for trial exists, the court applies the standard and burden associated with the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, (1986) ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]").

South Dakota substantive law applies to Houwman's claims because this case is before the court on the basis of diversity. *Hammonds v. Hartford Fire Ins. Co.*, 501 F.3d 991, 996 n.6 (8th Cir. 2007) ("We apply South Dakota substantive law because this diversity action was brought in the District of South Dakota, and the district court sitting in diversity applies the substantive law of the state in which it is located.") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

## DISCUSSION

### A.  Alienation of Affections

Houwman asserts an action for the alienation of his former wife's affections. The tort of alienation of affections is codified under SDCL 20-9-7. The judicially created elements of an alienation of affections claim are:

1.  Wrongful conduct by the defendant with specific intent to alienate one spouse's affections from the other spouse (such intent may develop at any point during the adulterous relationship);

2.  Loss of affection or consortium; and

3.  A causal connection between such intentional conduct and loss.

*State Farm Fire & Cas. Co. v. Harbert*, 741 N.W.2d 228, 235-36 (S.D. 2007) (citing *Pickering v. Pickering*, 434 N.W.2d 758, 762-63 (S.D. 1989)).

Gaiser contends that there are no material questions of fact and he should be awarded summary judgment for three reasons: (1) Gaiser did not have specific intent to entice the affections of Brittney from Houwman, (2) there was no lost affections between Houwman and Brittney, and (3) there was no causal connection between the affair and Brittney's loss of affections for Houwman.

11

### 1.   Specific Intent to Entice the Affections

The first prong of an alienation of affections claim is showing that the defendant acted with wrongful conduct "with specific intent to alienate one spouse's affections from the other spouse."[2] *Harbert*, 741 N.W.2d at 236. "[T]he specific intent to alienate affections is not required to be present 'from the outset' of the affair." *Id.* at 235 (citation omitted). "Rather, the specific intent to alienate one spouse's affections from the other spouse may develop at any point during the adulterous relationship." *Id.*

There is no dispute that Gaiser knew that Brittney was married to Houwman. There is evidence that Gaiser was attracted to Brittney and engaged in sexual intercourse with Brittney. There is also evidence that Gaiser wrote pornographic stories about sexual intercourse with Brittney in the office setting

---

[2] In *Kebede v. Hilton*, 580 F.3d 714 (8th Cir. 2009), the Eighth Circuit Court of Appeals stated that "actual intent to alienate the affection of the spouse of another need not necessarily be shown if defendant's conduct is inherently wrong and tends to, and does, have that effect." *Id.* at 716 (alteration, internal quotations, and citations omitted). The decision in *Kebede* relied on prior Eighth Circuit precedent that relied on a 1956 South Dakota case and did not address the more recent 2007 opinion of *Harbert,* which explicitly held that an alienation of affections claim requires the "specific intent to alienate one spouse's affections from the other spouse." 741 N.W.2d at 235. This court is bound by the South Dakota Supreme Court's holding as to the elements of the alienation of affections claim because this case is before the court on the basis of diversity jurisdiction. *See Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005) ("[W]e are bound by the decisions of the Missouri Supreme Court regarding issues of substantive state law."); *Hawkeye-Sec. Ins. Co. v. Davis*, 277 F.2d 765, 769 (8th Cir. 1960) ("In diversity cases it is our duty to apply state law as determined by state appellate courts . . . . [W]e must follow the rule of law there announced.").

before the sexual relationship began. Furthermore, e-mail exchanges show Gaiser professing his love to Brittney.  For example, on July 9, 2007, Gaiser wrote: "I know I love you deeply. I think you love me, too. I hate that I do, because it has really screwed some things up in my life. On the other hand - - :) - - it brought you and me closer, which I cherish." Docket 29-2 at 15. Viewing this evidence in the light most favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the court finds that the jury could reasonably conclude that Gaiser acted with the specific intent to alienate Brittney's marital affections from Houwman.

Despite Gaiser's claim to the contrary, Houwman does not have to prove that Gaiser intended that Brittney and Houwman would end their marriage. As explained above, Houwman must show that Gaiser intended to alienate the affections of that marriage. Also, the fact that Gaiser repeatedly told Brittney he would not end his marriage does not establish as a matter of law that Gaiser did not otherwise intend to gain Brittney's affections at Houwman's expense. *See Pickering*, 434 N.W.2d at 763 (finding a material issue of fact "as to whether [the defendant] acted purposefully to entice [the wife's] affections away from [the husband]"). Houwman has identified sufficient evidence to allow the jury to reasonably conclude that Gaiser intended to alienate those marital affections.

### 2.   Loss of Affections

Gaiser also contends that there was no loss of affections between Brittney and Houwman because Brittney never had affections for Houwman. With regard to this second element, the South Dakota Supreme Court has recognized that "if it appears there was no affection to alienate, recovery is precluded." *Pankratz v. Miller*, 401 N.W.2d 543, 546 (S.D. 1987). As a result, there may not be a loss of affections when the straying spouse did not love or express affections toward the other spouse prior to the intervening person's actions. *Id.* at 546-47 (recognizing that there was no loss of affections based, in part, on the straying spouse's testimony, "I have not loved [my spouse] for about four, five years now"). The presence of affection between the husband and wife can be inferred, however, from such things as remorseful letters from a straying wife, testimony from the husband that there was love, and testimony from family and friends that the couple "had a wonderful marriage." *Veeder v. Kennedy*, 589 N.W.2d 610, 617 (S.D. 1999).

Brittney told Gaiser during the affair that Houwman was the most important person in her life. Brittney also testified that she loved her husband before Gaiser's actions allegedly alienated her affections. In fact, Brittney testified she still loved Houwman, even after she began her affair with Gaiser. Gaiser relies on testimony from Brittney that she did not allow herself to love Houwman as much as she had loved her first husband. But the fact that

14

Brittney might not have loved Houwman as much as her first husband does not mean she had no love and affection for Houwman. Viewed in the light most favorable to Houwman, this evidence creates a material issue of fact as to whether Brittney had affections for Houwman before the affair. Thus, there is sufficient evidence for the jury to reasonably conclude that Houwman lost the affections of Brittney.

### 3.   Causality

Gaiser also argues that Houwman cannot establish a causal connection. The third requirement for an alienation of affections claim is a causal connection between the intentional conduct and the loss of affections.  Under South Dakota law:

> Unless it is established that the defendant is the enticer or the one who produced or brought about the alienation or separation, the mere proof that one spouse and the defendant are maintaining improper relations is not sufficient to support an action by the other spouse for the alienation of his or her affections.

*Pankratz*, 401 N.W.2d at 547 n.9 (quoting Annot., 19 A.L.R.2d 471 § 2, at 483 (1951)).

There is evidence that Brittney began having panic attacks the first night she was in a bed with Gaiser and those panic attacks continued. Brittney suffered from other mental health issues during and following the affair and considered herself emotionally unstable. There is evidence that this emotional

instability impacted her relationship with both her husband and her children and also impacted her ability to communicate with her husband.

Moreover, in the divorce action between Houwman and Brittney, the South Dakota Circuit Court granted the divorce to Houwman on the fault-based ground of adultery based on the affair between Gaiser and Brittney. That the affair was judicially determined as the cause of the divorce is probative evidence on the issue of whether or not Gaiser's conduct also caused the loss of affections. Gaiser relies on Dr. Susan Eleeson to diminish the significance of the divorce proceedings. But this would remain a question of fact for the jury to determine as to whether Gaiser's actions caused Houwman to suffer the loss of Brittney's affections. Thus, Gaiser's motion for summary judgment on the alienation of affections claim is denied.

### B. Deceit

Gaiser also moves for summary judgment as to Houwman's deceit claim. In South Dakota, "[o]ne who willfully deceives another, with the intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL 20-10-1. As used in SDCL 20-10-1, the definition of deceit provides:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

16

    (3)  The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

    (4)  A promise made without any intention of performing.

SDCL 20-10-2. As the South Dakota Supreme Court recently acknowledged, "a tort action for deceit requires proof that material, intentional misrepresentations were made and that the plaintiff relied on them." *Arnoldy v. Mahoney*, 791 N.W.2d 645, 660 (S.D. 2010) (citing *Littau v. Midwest Commodities, Inc.*, 316 N.W.2d 639, 643 (S.D. 1982)). And the deceit statutes "are declaratory of common law and comprehend an intent to mislead." *Id.* at 660 (internal quotations and citation omitted).

       Gaiser argues that there is no evidence that he had the required intent to induce Houwman to "alter his position to his injury or risk." Docket 28 at 6. Houwman argues that there is sufficient evidence for the jury to find that Gaiser's actions, or inaction, amounted to deceit as defined in SDCL 20-10-2. Houwman has not, however, identified any evidence that would allow for the jury to reasonably conclude that Gaiser acted with the intent to induce Houwman to alter his position. Indeed, the only evidence presented to this court is that Gaiser's alleged deceit was for the purpose of protecting his own reputation. Docket 28 at 6.

       Houwman objects to this fact as being taken out of context because his testimony was meant to be an example of how he abused his authority role over

17

Brittney. Docket 39 at 5. Assuming that Houwman is correct, it does not change the fact that Gaiser's ***intent*** behind his alleged deceit was to protect his own reputation, not to induce Houwman to alter his position to his injury. Moreover, even if Houwman did have the requisite intent, there is no evidence in the record that would allow the jury to reasonably conclude that Houwman relied on Gaiser's alleged deceit. Summary judgment is therefore granted as to the deceit claim because Houwman has failed to identify any evidence that would allow the jury to reasonably conclude that Gaiser's alleged deceit was accompanied with the requisite intent and because there is no evidence that would allow the jury to reasonably conclude that Houwman relied on Gaiser's alleged deceit.

### C.  Compensatory Damages

Gaiser claims that even if Houwman could prove the elements to alienation of affections, Houwman's damages are limited because the damages related to the Houwmans' subsequent divorce are not recoverable and not the proximate result of any alienation of affections. Because this matter is before the court on a motion for summary judgment, the only issue before the court is whether Houwman has evidence of any damages. The specifics of whether certain evidence is admissible on various categories of damages should be addressed in motions in limine prior to trial.

18

Alienation of affections is an action sounding in tort. The measure of damages for torts is determined by SDCL 21-3-1, which provides, "[f]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." *Id.* Specifically referring to damages for alienation of affections claims, the South Dakota Supreme Court recognized,

> [t]he plaintiff in an action for alienation of affections may recover for all direct and proximate losses occasioned by the tort, including loss of love and consortium, and he or she may recover for any physical pain, mental agony, lacerated feelings, wounded sensibilities, humiliation, blow to honor, hurt to family life, suspicion cast on offspring, etc.

*Morey v. Keller*, 85 N.W.2d 57, 59 (S.D. 1957) (citing 27 Am. Jur. *Husband and Wife* § 543). Because Houwman has evidence that he suffered mental agony, wounded sensibilities, humiliation, a blow to his honor, and a hurt family life, Gaiser is not entitled to summary judgment due to lack of any damages.

### D. Punitive Damages

Gaiser moves for summary judgment on Houwman's claim of punitive damages and to deny Houwman's Motion to Commence Discovery and Present Punitive Damages Claim at Trial. Docket 21. Gaiser argues that the facts and evidence do not support a claim for punitive damages because he did not act willfully, wantonly, or maliciously. Gaiser also argues that additional proof of

19

malice beyond the malice necessary to prove the tort of alienation of affections must be shown by Houwman.

> Under South Dakota law,
>
> [i]n any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, . . . committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

SDCL 21-3-2. "Malice is an essential element of a claim for punitive damages[.]" *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 761 (S.D. 1994). Malicious conduct may be actual or presumed. Actual malicious conduct "is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill will towards that person." *Case v. Murdock*, 488 N.W.2d 885, 891 (S.D. 1992). Presumed malicious conduct, conversely, exists "when a person acts willfully or wantonly to the injury of others" and "implies that the act complained of was conceived in the spirit of mischief or criminal indifference to civil obligations." *Id.* (citing *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991)). Malicious conduct can also be proven with a showing of "a disregard for the rights of others." *Id.* (citing *Flockhart v. Wyant,* 467 N.W.2d 473, 475 (S.D.1991)).

The South Dakota Supreme Court has defined willful and wanton misconduct as an action that "demonstrates an affirmative, reckless state of

mind or deliberate recklessness on the part of the defendant." *Tranby v.*

*Brodock*, 348 N.W.2d 458, 461 (S.D. 1984). In addition,

> [t]here must be facts that would show that defendant intentionally
> did something . . . which he should not have done or intentionally
> failed to do something which he should have done under the
> circumstances that it can be said that he consciously realized that
> his conduct would in all probability, as distinguished from
> possibility, produce the precise result which it did produce and
> would bring harm to the plaintiff.

*Id.*

Gaiser knew Brittney was married to Houwman before he began an

extramarital affair with her. Gaiser knew he and Brittney were "crossing lines"

they should not be crossing when they began to flirt, and he knew as her

supervisor that a relationship would be complicated, but he chose to begin and

continue the relationship anyway. Specifically, Gaiser admitted that he knew

the right thing to do was to stop his relationship with Brittney. The jury could

find that Gaiser consciously understood that in all probability his actions of

continuing a relationship with a married woman would harm her marriage or

even lead to its dissolution. Gaiser understood the risks, recognized the

wrongfulness of the conduct, and chose to forge ahead. There is sufficient

factual evidence for a jury to conclude that Gaiser acted with a reckless state of

mind or that his actions amounted to presumed malicious conduct. Presumed

malicious conduct can be shown by "a disregard for the rights of others," and it

is probable Gaiser disregarded the rights of Houwman and Brittney when he began and continued a wrongful affair.

Gaiser claims that the punitive damages claim may continue only if there is "evidence of circumstances of aggravation beyond the proof of malice necessary to satisfy the elements of the tort to sustain a recovery of compensatory damages." Docket 27 at 30. This is not the law of South Dakota. *See Veeder v. Kennedy*, 589 N.W.2d 610 (S.D. 1999) (following the jury's award of $200,000 in punitive damages in an alienation of affections claim, the South Dakota Supreme Court did not note any additional factors necessary to prove malice and affirmed the award). Further, in *Jones v. Swanson*, 341 F.3d 723, 736 (8th Cir. 2003), the Eighth Circuit Court of Appeals affirmed the district court's decision to deny the defendant's motion for judgment as a matter of law on the jury's award of punitive damages when the court was sitting in diversity and applying South Dakota law in an alienation of affections claim.

Houwman claims that his burden is surmounting SDCL 21-1-4.1, which provides that the burden in proving punitive damages is to show a prima facie case for punitive damages through clear and convincing evidence of a reasonable basis for the claim. Docket 22. This is not the case. In *Amman v. Masse-Ferguson, Ltd.*, 933 F. Supp. 840 (D.S.D. 1996), the district court determined this statute does not apply to federal courts sitting in diversity because it is purely procedural and conflicts with the federal rules of evidence.

Therefore, the statute's requirement of a hearing before commencing discovery, as well as the statute's language, does not apply to this action in federal court.

Viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of the nonmoving party, there is sufficient evidence for the jury to reasonably conclude that Gaiser acted willfully, wantonly, or maliciously such that punitive damages would be appropriate.

## CONCLUSION

Dr. Eleeson's expert testimony and opinion is admissible because the testimony would assist the trier of fact in its determination, she is sufficiently qualified to offer her opinion, and her knowledge is reliable. Thus, plaintiff's motion to exclude her testimony is denied. There is sufficient factual basis for the jury to conclude that Gaiser did alienate Brittney's affections, so the motion for summary judgment on that claim is denied. There is insufficient evidence that Gaiser intended to deceive Houwman, so the motion for summary judgment as to the deceit claim is granted. There is evidence that Houwman's damages from his divorce could be the actual and proximate loss resulting from Gaiser's tortious conduct, so the motion for summary judgment is denied as to that claim. Finally, the jury could conclude that Gaiser acted maliciously or willfully and wantonly such that punitive damages would be appropriate. Summary judgment is denied on the punitive damages claim. Houwman is not

precluded by South Dakota procedural law from commencing discovery on the punitive damages claim.

Accordingly, it is

ORDERED that the motion to exclude expert Dr. Susan Eleeson (Docket 24) is denied, and the motion to commence discovery is denied as moot (Docket 21);

IT IS FURTHER ORDERED that the motion for summary judgment (Docket 26) is granted as to the deceit claim; and

IT IS FURTHER ORDERED that the motion for summary judgment is denied as to the alienation of affections claim, the compensatory damages claim, and the punitive damages claim.

Dated September 15, 2011.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

24